UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

| | | |
|---|---|---|
| HENRI JOSEPH PLOVIE #243933, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:05-cv-128 |
| | ) | |
| v. | ) | HON. RICHARD ALAN ENSLEN |
| | ) | |
| VICTORIA JACKSON, *et al.*, | ) | |
| | ) | **OPINION** |
| Defendants. | ) | |
| _____ | ) | |

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has paid the initial partial filing fee. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996) ("PLRA"), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 42 U.S.C. § 1997e(c); 28 U.S.C. §§ 1915(e)(2), 1915A. The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint, in part, for failure to state a claim.

**Discussion**

    I.       Factual Allegations

Plaintiff Henri Joseph Plovie, an inmate at the Straits Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Counselor Victoria Jackson, Resident Unit Manager ("RUM") Gillford Bettinger, RUM J. N. Denman, and Assistant Deputy Warden Linda Verlin, who are employed at the Charles E. Egeler Correctional Facility. Prior to transferring the case to this court, the Eastern District dismissed these Defendants for failure to state claim. *See Plovie v. Jackson*, No. 05-CV-71440-DT (E.D. Mich. May 23, 2005).

Plaintiff also names Defendants RUM Paul Thomasini, Administrative Deputy Warden Jim Young, Administrative Deputy Warden Dan Quigley, Warden Terry Sherman, Inspector Martin Osterman, Corrections Officer Unknown Justinak, RUM Mike Newton, Unknown Corrections Officer John Doe, and Unknown Prisoner John Doe a/k/a "Hercules," all of whom are either employed at or reside at the Ojibway Correctional Facility (OCF). Plaintiff is also suing Defendants Karen Dennis, R.N., Michell Horton, R.N., Dental Assistant Anita Lovegrone, and Dentists Ken Owen and John Tschudy, all of whom are employed at the Hiawatha Correctional Facility (HTF). Finally, Plaintiff names Correctional Medical Services (CMS) as a defendant.

In Plaintiff's complaint, he asserts that while he was confined at the Charles Egeler Correctional Facility, he received a Notice of Intent ("NOI") to increase his security level from I to II. Plaintiff states that this NOI was based on false information, including a misconduct charge for which Plaintiff was ultimately found "not guilty." Plaintiff was transferred to OCF on April 28, 2003, based on his security reclassification. Plaintiff states that a number of the OCF Defendants refused to remove the NOI from his file, despite the fact that he had been found not guilty of the underlying misconduct. In addition, Plaintiff alleges that Defendant "Hercules," a prisoner at OCF,

assaulted him and that OCF employees failed to protect him from this assault. Moreover, Plaintiff claims that he was denied needed medical care following the assault.

With regard to the HTF Defendants, Plaintiff claims that he received several misconduct tickets in retaliation for filing grievances and/or lawsuits. In addition, Plaintiff claims that he was denied parole while at HTF because of his legal activities. Finally, Plaintiff states that HTF Defendants denied him needed medical care. Plaintiff seeks nominal, compensatory and punitive damages, as well as declaratory relief.

> II.    Failure to state a claim

A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle*, 3 F.3d 945, 947 (6th Cir. 1993). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

As noted above, Plaintiff's claims against Defendants Jackson, Denman, Bettinger and Verlin have already been dismissed by the United States District Court for the Eastern District of Michigan. *See Plovie v. Jackson*, No. 05-CV-71440-DT (E.D. Mich. May 23, 2005). Therefore, the Court need not address Plaintiff's allegations against Defendants Jackson, Denman, Bettinger and Verlin.

Plaintiff claims that Defendants Sherman, Thomasini, Young and Quigley violated his due process rights by refusing to remove the NOI from his file. Plaintiff further states that this conduct was in furtherance of a conspiracy with Defendants Denman and Verlin, to keep Plaintiff at a higher security level. However, an increase in security classification does not constitute an "atypical and significant hardship" on Plaintiff in relation to the ordinary incidents of prison life because a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

Plaintiff further claims that his increased security level caused him to receive two negative points on the Parole Guidelines Score sheet, adversely affecting Plaintiff's chance of receiving parole. However, Plaintiff's due process claim regarding his decreased likelihood of receiving parole fails because he has no liberty interest in being released on parole. There is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so, and, thus, the presence of a parole system by itself does not give rise to a constitutionally-protected liberty interest in parole release. *Id.* at 7; *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). Rather, a liberty interest is present only if state law entitles an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

The Sixth Circuit, noting "the broad powers of the Michigan procedural authorities to deny parole," has held that the Michigan system does not create a liberty interest in parole. *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994) (en banc); *see also Hawkins v. Abramajtys*, No. 99-1995, 2000 WL 1434695, at *2 (6th Cir. Sept. 19, 2000) ("Michigan's parole

scheme does not create a protected liberty interest in parole because the Michigan Parole Board has broad discretion to recommend or deny parole"). In unpublished decisions, the Sixth Circuit also has held that particular parts of Michigan's statutory parole scheme do not create a liberty interest in parole. *See Fifer v. Michigan Dep't of Corr.*, No. 96-2322, 1997 WL 681518, at *1 (6th Cir. Oct. 30, 1997); *Moran v. McGinnis*, No. 95-1330, 1996 WL 304344, at *2 (6th Cir. June 5, 1996); *Vertin v. Gabry*, No. 94-2267, 1995 WL 613692, at *1 (6th Cir. Oct. 18, 1995); *Leaphart v. Gach*, No. 95-1639, 1995 WL 734480, at *2 (6th Cir. Dec. 11, 1995); *Janiskee v. Michigan Dep't of Corr.*, No. 91-1103, 1991 WL 76181, at *1 (6th Cir. May 9, 1991); *Neff v. Johnson*, No. 92-1818, 1993 WL 11880, at *1 (6th Cir. Jan. 21, 1993); *Haynes v. Hudson*, No. 89-2006, 1990 WL 41025, at *1 (6th Cir. Apr. 10, 1990). Further, the Michigan Supreme Court has recognized that there is no liberty interest in parole under the Michigan system. *Glover v. Michigan Parole Bd.*, 460 Mich 511, 521, 596 N.W.2d 598, 603-604 (Mich. 1999).

With regard to the alleged assault and battery, Plaintiff states in his complaint that on September 24, 2003, while playing floor hockey in the gymnasium at OCF, he was tripped by an inmate named "Jr." Jr. subsequently became irritated with Plaintiff for blocking him, and left the gymnasium. Jr. returned shortly thereafter with five African American inmates, who insisted that Plaintiff come over to them. There was a verbal exchange, after which the five left the area. Defendant Justinak observed the entire exchange from his desk, approximately 20 feet away. After the game, Plaintiff returned to his housing unit. Later that evening, Plaintiff was told that there was an inmate down the hall who wished to speak to him. When Plaintiff stepped out of the unit to smoke a cigarette, the same five African American prisoners approached him. One of the men, an inmate who goes by the name of "Hercules," asked Plaintiff why he had hit Jr. in the eye. Plaintiff denied such conduct and Hercules responded by hitting Plaintiff in the mouth. Plaintiff states that

Hercules had an object, which appeared to be a padlock, in his hand. As a result of this assault, Plaintiff lost five teeth. Plaintiff claims that he also suffered from physical and emotional pain, was required to undergo multiple surgeries, and has a permanent disability as a result of Defendant Hercules' actions.

As noted above, Plaintiff names inmate "Hercules" as a Defendant in this case. However, to prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a right secured by the Constitution or the laws of the United States. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The defendant inmate in this case is not a state actor against whom claims can be asserted under Section 1983. Therefore, Defendant John Doe Unknown Prisoner, a/k/a Hercules, is properly dismissed as a defendant from this action.

Plaintiff claims that Defendants Justina, Young, Quigley, Sherman and Defendant John Doe Unknown Officer were deliberately indifferent to the danger of an assault after observing the incident in the gymnasium in violation of Plaintiff's Eighth Amendment rights. In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the defendant would cause prisoners serious harm. *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997); *Street*, 102 F.3d at 814; *Taylor*

*v. Michigan Dep't of Corrs.*, 69 F.3d 76, 79 (6th Cir. 1995). *See also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

In this case, Plaintiff alleges that Defendant Justinak observed a verbal confrontation between himself and five African American prisoners, which did not involve any sort of physical violence. Such an allegation, without more, does not indicate that Plaintiff was likely to be assaulted or that he was in any special danger. Plaintiff did not ask for protection. In fact, it does not appear that Plaintiff himself was aware that he was in any particular danger. Because Plaintiff has failed to show that Defendant Justinak failed to protect Plaintiff despite an awareness of some substantial risk of harm, his "deliberate indifference" claim is properly dismissed as to Defendant Justinak.

Plaintiff claims that Defendants Young, Quigley, Sherman and John Doe Unknown Corrections Officer violated his Eighth Amendment rights because they failed to maintain adequate security measures during the time of the attack. Plaintiff states that, at the time of the attack, there were no staff in the vicinity. However, Plaintiff fails to allege that Defendants Young, Quigley, Sherman and John Doe Unknown Corrections Officer were aware of a substantial risk of harm to Plaintiff at the time of the incident. Without such an awareness, Plaintiff's allegations against Defendants Young, Quigley, Sherman and John Doe Unknown Corrections Officer fail to state a claim under the Eighth Amendment for failure to protect Plaintiff from the assault. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 32; *Woods*, 110 F.3d at 1222; *Street*, 102 F.3d at 814; *Taylor*, 69 F.3d at 79.

Plaintiff states that after the assault, he was rushed to the prison clinic, where it was determined that he had lost five teeth and suffered severe trauma to his jaw and neck. Plaintiff was subsequently taken to the emergency department at the Grand View Hospital, where he was examined and x-rays were taken. In addition, Plaintiff gave a description of the assault to State

Police Officers. When Plaintiff was returned to the prison, he was told that he would be taken to the county jail. Plaintiff explained that he could not leave the prison as he had an appointment to see the Prison Dentist in the morning because a number of his teeth were "on the verge" of coming out. Plaintiff was then directed to sign a waiver and was escorted back to F-Unit and placed on room restriction.

On September 25, 2003, Plaintiff was seen by the dentist, who determined that he had suffered extensive damage and that four additional teeth had to be removed. Plaintiff was placed on a liquid diet, medication and continued room restriction. Plaintiff states that other inmates brought him information regarding the room number of his assailant, prompting Plaintiff to write a statement, which he gave to Assistant Resident Unit Supervisor Veda. On the same day, a new security classification screen was done on Plaintiff, lowering Plaintiff's security level to a Level I. On September 26, 2003, Plaintiff was shown a series of inmate photos, and Plaintiff identified the inmate who had assaulted him. Plaintiff was then placed in a special cell for protective custody and inmate Hercules was transferred to the Baraga Maximum Correctional Facility. Plaintiff was transferred to HTF on September 29, 2003, and attempted to pursue criminal charges against inmate Hercules through the state court system.

On February 2, 2004, Plaintiff's mother requested copies of the pictures and incident report taken at Grand View Hospital. She eventually received 19 photos of what appeared to be foot prints and tire tracks. When Plaintiff's mother received the Michigan State Police report, it had a different incident report number on it than the number given to Plaintiff at the hospital. There appear to be discrepancies in Plaintiff's file regarding whether his attacker was ever positively identified. On March 19, 2004, Plaintiff sent a letter to Inspector Falbo and Defendant Osterman, requesting a Special Problem Offender Notice ("SPON") be placed in his file to prevent Plaintiff from being

placed in the same facility as prisoner "Hercules." Plaintiff's request was refused. Plaintiff filed a grievance on Defendant Osterman for refusing to place a SPON in Plaintiff's file. In responding to Plaintiff's grievance, Defendant Osterman stated that a SPON was not completed at OCF because the facility had no proof regarding the identity of the assailant. Plaintiff claims that Defendant Osterman knew or should have known that Plaintiff had identified his assailant and that the failure to protect Plaintiff from being placed in the same facility constitutes deliberate indifference.

As noted above, Plaintiff must allege that Defendant Osterman was aware of a substantial risk of harm to Plaintiff arising from his failure to act in order to succeed on an Eighth Amendment failure to protect claim. The Court notes that the step III response to Plaintiff's grievance, which is attached to Plaintiff's complaint as Appendix 85c, indicates that although there was a previous grievance response stating that the assailant had been identified and transferred, insufficient information had been presented from which to positively identify the attacker and issue a SPON. Also attached to Plaintiff's complaint as Appendix 85a is a copy of the Michigan State Police supplemental incident report. According to that report, Michigan State Police Officer Steven M. Koskela spoke to Defendant Osterman, who told him that they "got eight different statements and none of them were similar." Defendant Osterman also told Koskela that he thought Plaintiff knew his attacker, but was refusing to "finger" him in the investigation. Finally, Plaintiff is not currently confined with inmate "Hercules," nor does he allege that he is likely to be so confined in the near future. Based on a review of the exhibits to Plaintiff's complaint, it does not appear that Defendant Osterman's denial of Plaintiff's request for a SPON was done with the requisite "deliberate indifference" to a substantial risk of harm to Plaintiff. Therefore, this claim is properly dismissed.

With regard to his retaliation claims, Plaintiff states that on the date of his transfer to HTF, September 29, 2003, he was subjected to a routine shake-down of all his property.

Consequently, Corrections Officer Coit confiscated Plaintiff's belt, footlocker, television, radio, tape player, and some of his clothing. On September 30, 2003, Defendant Newton ordered Plaintiff to move from bunk A-1-6 to A-1-34. The following day, Defendant Newton issued Plaintiff a minor misconduct for having his shirt untucked in the unit. On October 7, 2003, Assistant Resident Unit Supervisor Wolski held a hearing on the confiscated property and ordered a return of the television, footlocker, tape player, radio and belt. The other items were destroyed. Wolski also ordered Plaintiff to perform 10 hours of extra duty for having his shirt untucked in the unit.

On December 1, 2003, Defendant Newton came up behind Plaintiff and asked him how much he got paid to type a grievance. Defendant Newton then placed a hand on Plaintiff's shoulder and told Plaintiff that he was moving to A-1-36. Later that day, Defendant Newton returned to Plaintiff's cubicle and ordered him to do a "mock pack up." Defendant Newton again confiscated Plaintiff's television, radio, tape player, and lamp, and issued Plaintiff a minor misconduct for contraband. Plaintiff filed a grievance on Defendant Newton for inappropriate physical contact, which was denied because Defendant Newton denied the allegations. Plaintiff filed a grievance on Defendant Newton for insubordination after Sergeant Horton called the unit and ordered the return of Plaintiff's property because he had already had a hearing on it. This grievance was also denied. Finally, Plaintiff filed a grievance on Defendant Newton, Assistant Resident Unit Supervisor Wolski and Sergeant Horton for holding two hearings on the same property in violation of prison rules. This grievance was denied. Plaintiff was again ordered to move to a new bunk on December 3, 2003, by Defendant Newton.

Plaintiff alleges that during the months of October, November, and December, Plaintiff attended the law library to work on his civil action and used the card room for typing. Defendant Newton became aware of Plaintiff's legal activities and would occasionally walk the

hallway, loudly stating that anyone who filed a grievance would have ten tickets coming. Defendant Newton took a leave of absence from January 2004, until the first week of March 2004. During this time, Plaintiff did not receive any tickets or other disciplinary actions.

On February 2, 2004, Plaintiff had a parole interview, after which he received a deferral. The notice of deferral stated that Plaintiff was to have a psych evaluation, which could delay a decision for up to three months. Plaintiff ultimately received a 12 month continuance. On March 19, 2004, another inmate told Plaintiff that he had overheard Defendant Newton state that if Plaintiff received parole, he was going to "snatch it." On March 21, 2004, Defendant Newton issued a summary to Plaintiff for leaving out personal property. When Plaintiff refused to sign the summary, he was given a minor misconduct ticket and was ordered to perform a mock pack-up. Plaintiff filed a grievance on Defendant Newton, alleging retaliation, which was denied. Defendant Newton also issued Plaintiff a major misconduct ticket for disobeying a direct order when Plaintiff attempted to return some food items to his cubicle before performing the mock pack-up. Plaintiff subsequently requested a rehearing and filed a petition for judicial review on this misconduct. Plaintiff claims that the petition for judicial review is pending in the Ingham County Circuit Court.

On May 3, 2004, Plaintiff received a time review from Warden Metrish, indicating a forfeiture of 30 days of good time. On September 1, 2004, Defendant Newton posted a handwritten warning on the unit bulletin board, indicating that any prisoner caught with his pants hanging low would receive a major sexual misconduct and stating, "Good Luck at the Parole Board, C/O Newton." On November 1, 2004, Plaintiff had his second parole board interview, and received a 12 month continuance, in part, because of his recent misconduct tickets.

On December 16, 2004, Defendant Newton sent Plaintiff to a section of the prison where he did not lock in order to look at a "going away present" for another inmate, who was being

discharged. When Plaintiff arrived at the area, there was a drawing of a man standing at the foot of a bunk with his penis in his hand, masturbating, with a man lying on his stomach on the bed in front of him. Plaintiff immediately left the area. Later that evening, the prisoner who was being discharged gave the drawing to Plaintiff, who sent it home along with statements from other prisoners describing the misconduct of Defendant Newton. Plaintiff filed a grievance on Defendant Newton for sending him to look at the drawing.

On December 30, 2004, Defendant Newton ordered Plaintiff to submit to a shakedown. Plaintiff complied and, during the shakedown, Defendant Newton struck him in the testicles with such force that Plaintiff required medical treatment. Defendant Newton told Plaintiff that the assault was in retaliation for filing grievances and that he was going to write Plaintiff a major misconduct for insolence. Defendant Newton issued Plaintiff a major and a minor misconduct ticket. Plaintiff wrote a grievance on Defendant Newton for this incident, but the grievance was denied by Warden Metrish. On January 19, 2005, after Plaintiff was transferred to the Straits Correctional Facility, he was found guilty of the major misconduct for insolence. Plaintiff filed a request for rehearing which was pending at the time he filed his complaint.

Plaintiff contends that Defendant Newton retaliated against Plaintiff for filing grievances and court actions by filing false disciplinary charges on Plaintiff, subjecting him to frequent bunk moves and mock pack-ups, confiscating Plaintiff's property on more than one occasion, harassing Plaintiff and, on one occasion, by striking Plaintiff in his testicles. The Court concludes that such allegations are sufficient to set forth a retaliation claim. Therefore, Plaintiff's retaliation claim against Defendant Newton may not be dismissed upon initial screening.

Plaintiff claims that he was denied medical/dental care in violation of the Eighth Amendment. Upon Plaintiff's transfer to HTF, he began submitting health care requests for dental

treatment. Plaintiff submitted health care requests dated November 1, 2003, January 9, 2004, and February 8, 2004. On February 11, 2004, Plaintiff was seen by Defendant Tschudy, who asked when Plaintiff would be going home. Plaintiff replied that he had recently had a parole interview and had not yet received a decision. Defendant Tschudy told Plaintiff that he would not be doing any dental treatment until he knew whether Plaintiff would be going home. On March 16, 2004, Plaintiff sent a health care request, asking for dental treatment. Defendant Lovegrone responded that Plaintiff's name was on the list for more extractions, and that it would be awhile because there was a back-up as a result of the computer implementation. On April 16, 2004, Plaintiff again requested dental care, stating that he was in desperate need of "some teeth." Defendant Lovegrone again stated that Plaintiff was on the list for more extractions. On May 9, 2004, Plaintiff requested dental care, asking how long it would be before he could get teeth, and stating that it was embarrassing and humiliating to be without teeth. Defendant Lovegrone indicated that Plaintiff's name was coming up on the list and that Plaintiff should keep watching the call out.

   Defendant Tschudy performed oral surgery on Plaintiff on July 1, 2004. Following surgery, Defendant Lovegrone gave Plaintiff twelve packs of Ibuprofen 200 mg, which Plaintiff used up overnight. The following day, Plaintiff was suffering from severe pain, so he asked Resident Unit Officer Martin to contact the dental department. Resident Unit Officer Martin was told that there was nothing they could do for Plaintiff. Plaintiff filed a grievance on Defendant Tschudy for inhumane treatment. Defendants Dennis and Owens responded to the grievance by stating that "appropriate analgesics were dispensed." On July 9, 2004, Defendant Tschudy removed five sutures from Plaintiff's mouth. On September 26, 2004, Plaintiff requested an appointment so that he could get his new teeth. Plaintiff also filed a grievance against Defendants CMS, Dennis, Horton, Lovegrone, Owen and Tschudy for depriving him of his dental needs, which was denied.

On October 20, 2004, final impressions were taken of Plaintiff's teeth and on October 28, 2004, Plaintiff had an updated photo taken. On March 2, 2005, Plaintiff finally received poor quality dentures, which did not fit properly. Plaintiff claims that his dental treatment was so poor that it violated his rights under the Eighth Amendment. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 2004 WL 2792016, at *7 (6th Cir. 2004). If, however, the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 2004 WL 2792016, at *6, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867

(6th Cir. 2000) (citing *Farme*r, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. April 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the

treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also*, *Brock v. Crall*, No. 00-5914, 2001 WL 468169, at *2 (6th Cir. Apr. 27, 2001; *Jones v. Martin*, No. 00-1522, 2001 WL 223859, at *1 (6th Cir. Feb. 28, 2001); *Williams v. Mattson*, No. 99-1796, 2000 WL 924145, at *1 (6th Cir. June 28, 2000); *Davis v. Ulep*, No. 97-2124, 1999 WL 98390, at *1 (6th Cir. Jan. 29, 1999); *Cain v. Huff*, No. 96-1613, 1997 WL 377029, at * 4 (6th Cir. July 2, 1997); *Gabehart*, 1997 WL 160322, at * 2.

In this case, Plaintiff received dental care, including the extraction of problem teeth, and the manufacture of dentures. Plaintiff's claim relates to various delays in receiving the treatment, as well as to the quality of the treatment rendered. However, such claims do not rise to the level of an Eighth Amendment violation.

## **Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action is properly dismissed, in part, for failure to state a claim and will therefore be partially dismissed pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A(b); 42 U.S.C. § 1997e(c). As noted above, Plaintiff's retaliation claim against Defendant Newton is non-frivolous and will not be dismissed at this time.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $255 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is

barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $255 appellate filing fee in one lump sum.

      An Partial Judgment consistent with this Opinion will be entered.

|  |  |
|---|---|
| | /s/ Richard Alan Enslen |
| DATED in Kalamazoo, MI: | RICHARD ALAN ENSLEN |
| September 29, 2005 | SENIOR UNITED STATES DISTRICT JUDGE |